RECEIVED

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

2007 APR 27 PM 3: 35

MIDDLE DISTRICT OF FLOR
JACKSONVILLE, FLORIDA

IN THE MATTER OF THE APPLICATION
OF GALINA WEBER,

       Petitioner,

v.

FOR DISCOVERY FROM LAZAR
S. FINKER, an individual, RAISSA M.
FRENKEL, an individual, STEVEN
CHARLES KOEGLER, an individual,
WILLIAM E. CHATTIN, an individual,
THEODORUS J. KAVALIEROS, an
individual, AFRODITI KAVALIEROS,
an individual, and IGOR V. MAKAROV,
and individual

       Respondents.

CASE No.: 3:07-mc-27-g-32TEM

_____/

### PETITION FOR DISCOVERY
### IN AID OF FOREIGN PROCEEDINGS

Petitioner Galina Weber, pursuant to Title 28 United States Code Section 1782, respectfully moves the Court to enter an Order permitting discovery in aid of foreign and international legal proceedings currently pending in the Republic of Cyprus and Switzerland, from Respondents residing, or who may be found, within the Middle District of Florida, to wit: Lazar S. Finker, Raissa M. Frenkel, Steven Charles Koegler, William E. Chattin, Theodorus J. Kavalieros, Afroditi Kavalieros, and Igor V. Makarov.

## I.    Parties, Jurisdiction & Venue

1. Petitioner Galina Weber is a citizen of Switzerland and a resident of the Principality of Monaco and has been a shareholder of Itera Group, Ltd., a Cypriot corporation ("Itera Group"), since its incorporation in August 2004.

2.   Respondents Lazar S. Finker, Raissa M. Frenkel, Steven Charles Koegler, William E. Chattin, Theodorus J. Kavalieros, Afroditi Kavalieros and Igor V. Makarov (collectively, the "Florida Shareholders") are also each shareholders of Itera Group as well as residents and/or may be found within the State of Florida.

3.   On or about March 2006, Galina Weber filed suit in the District Court of Limassol, Cyprus against Defendants: 1) Itera Group; 2) Igor V. Makarov ("Makarov"); and 3) Sweet Water Intervest Corporation of the British Virgin Islands, (a private company controlled by Makarov) ("Cypriot Action"). A true and correct copy of the Statement of Claim in the Cypriot Action is attached hereto as **Exhibit A**.

4.   Although the Cypriot Action remains pending, on March 29, 2006 the Cypriot Court entered an interim judgment against Makarov preventing him from selling and/or transferring his thirty percent (30%) share of Itera Group.  A true and correct copy of the Interim Judgment is attached hereto as **Exhibit B**.

5.   In the Fall of 2006, criminal charges were filed against Galina Weber in Switzerland for allegedly embezzling Itera Group assets ("Swiss Action").   These allegations were based primarily on accusations and information provided by Makarov and Itera Group officials.

6.   The Swiss Action remains pending against Galina Weber and a true and correct copy of the recently released criminal claim is attached hereto as **Exhibit C.**

7.   The Florida Shareholders, excepting Makarov, are not individually named parties to either the Cypriot or Swiss Actions.

8.   Upon information and belief, each of the Florida Shareholders resides or may be found within the Middle District of Florida.  A true and correct copy of the Cypriot Certificate of Shareholders is attached hereto as **Exhibit D**.

9.  This Court possesses exclusive jurisdiction over this matter pursuant to Title 28 United States Code Sections 1331 & 1782 as this application is for discovery, from witnesses located within the Middle District, to assist Galina Weber in her ongoing foreign cases in Cyprus and Switzerland.

10. Venue in the Middle District is appropriate pursuant to Title 28 United States Code Section 1782 because discovery is being sought from individuals located within this judicial district.

## II.    Factual Background

11. Itera Group is the international parent corporation for numerous subsidiaries worldwide, including Itera International Energy, Corporation, a Florida corporation with its principal address of business in Jacksonville, Florida.

12. Itera Group's assets are primarily related to the oil and gas market and are valued in excess of $2.5 billion

13. Makarov is the chief executive officer of Itera Group, president of the Itera Group Board of Directors, and owner of the largest percentage of shares of any shareholder.

14. From 1995 until being effectively frozen out of the company in December 2005, Galina Weber was continuously involved with Itera Group and its predecessor corporation, Itera Group, NV.  She is a former employee and director of Itera Group subsidiaries.

15. Prior to the Itera Group's increase in capital shares in November 2005, Galina Weber held 437,142 shares of common stock, constituting a 14.5714 percent (14.5714%) ownership interest in Itera Group, making her the second largest shareholder.  As discussed in more detail below, one issue being determined in the Cypriot Action is the claim of Galina Weber that such an increase in capital shares was illegal.

16. After the illegal increase in capital shares of Itera Group, Galina Weber's ownership interest was diluted from 14.5714 percent (14.5714%) to 4.8571 percent (4.8571%).

17. In filing the Cypriot Action against Itera Group, Galina Weber also alleged the Defendants conspired to improperly dilute her ownership interest by creating six million (6,000,000) new shares of Itera Group at an Itera Group Board meeting in November 2005.

18. The Swiss Action is grounded upon baseless complaints made by Makarov and the principals of Itera Group that Galina Weber, among other items, embezzled and/or improperly managed Itera Group assets.

19. Galina Weber, if convicted, faces multiple years of incarceration and tens of thousands of dollars in fines.

20. On July 27, 2006, fellow Itera Group shareholder Olga Krutova ("Krutova"), filed her own lawsuit against Defendant Itera Group in the District Court of Limassol, Cyprus.[1]  Krutova prayed for entry of an Order: 1) establishing her right to a particular percentage of shares; and 2) dissolving Itera Group.

21. While the Krutova lawsuit remains pending, on February 16, 2007, the Krutova Court issued an interlocutory judgment prohibiting: 1) Itera Group from transferring any shares of the company belonging to Makarov and Sweet Water Intervest (among other companies), up to 245,214 shares; and 2) Itera Group from proceeding with any increase of its nominal and/or issued capital and/or to issue any shares. A true and correct copy of the Interlocutory Judgment is attached hereto as **Exhibit E**.

**A. The $80 Million Dividend declared by Itera Group**

---

[1] The Weber matter and the Krutova matter are not being heard by the same Limassol District Court.

4

22. On or about January 28, 2005, the Itera Group Board of Directors approved payment of dividends to its shareholders in the total amount of $80 million, to be disbursed in two separate tranches ("First and Second Tranche") of $40 million each.

23. In February 2005, upon information and belief, the principals of Itera Group distributed the First Tranche to the shareholders in accordance with their respective ownership interest.

**B. The Distribution of the First Tranche**

24. In March 2005, Itera Group distributed the first half ($40 million) of the $80 million dividend approved in January 2005 ("First Tranche").

25. Upon information and belief, each shareholder in Itera Group, including Galina Weber, received a proportionate share of the First Tranche based on his or her ownership interest.

**C. The Offers to Buy Galina Weber's Shares of Itera Group**

26. In May 2005, Makarov offered to purchase all but two and one half percent (2.5%) of Galina Weber's fourteen and one half percent (14.5%) ownership interest for the purchase price of $44.8 million.  In other words Makarov sought to acquire from her an additional twelve percent (12%) ownership interest in Itera Group.

27. The $44.8 million purchase price included both the sale of the shares as well as payment of Galina Weber's proportionate share of the Second Tranche.

28. Galina Weber accepted Makarov's offer, and they agreed to consummate the transaction at the next Itera Group board meeting, to be held on May 28, 2005.

29. On May 28, 2005, at the Itera Group board meeting, Makarov refused to execute the agreement to purchase Galina Weber's shares.

30. Subsequently at the same meeting, several individual Itera Group shareholders then offered to purchase Galina Weber's twelve percent (12%) ownership interest.

31. Galina Weber accepted the individual shareholders' offer, and thereafter, a contract memorializing the agreement was prepared; however, the shareholders never performed under the contract (although they had agreed to buy and correspondingly signed a Transfer Notice) because Makarov pressured the shareholders not to execute the agreement.

32. Subsequently, representatives of Makarov repeatedly offered to purchase Galina Weber's shares at progressively lower and lower prices. Galina Weber rejected these offers.

**D. The Distribution of the Second Tranche**

33. Upon information and belief, the Itera Group Board of Directors approved the distribution of the Second Tranche at the May 28, 2005 meeting ("Second Tranche"). In other words, the remaining $40 million from the total $80 million approved dividend was distributed.

34. On information and belief, the Florida Shareholders devised a scheme to avoid tax liabilities associated with payment of the Second Tranche. This scheme involved Itera Group paying each Florida Shareholder his or her proportionate share of the Second Tranche through a shell company in the form of a loan, rather than as dividends, which would be taxable.

35. Galina Weber did not receive her proportionate share of the Second Tranche. Itera Group and Makarov favored all of the other Itera Group shareholders by paying them the full amounts they were due from the $80 million dividend while withholding from Galina Weber most of what was due her. In fact, Galina Weber's distribution from the Second Tranche was proportionate to approximately a two and one half percent (2.5%) ownership interest rather than her full fourteen and one half percent (14.5%) ownership interest in Itera Group. The missing twelve percent (12%) would have entitled her to an additional $4.8 million.

6

**E. Dilution of Galina Weber's Shares**

36. After breaching the agreements to buy Galina Weber's shares, on or about November 27, 2005, in an effort to dilute Galina Weber's entire ownership interest, Itera Group's Board of Directors voted to increase the number of authorized shares in Itera Group by six million (6,000,000) shares.

37. On information and belief, the remaining shareholders of Itera Group were permitted to purchase an amount of shares to enable them to maintain their overall percentage of ownership prior to the capital share increase. This purchase was funded by Itera Group and/or an affiliated company and not by the individual shareholders.

38. In contrast, Galina Weber would have had to fund any purchase of shares from her own personal funds with the knowledge that Itera Group and Makarov would continue to breach fiduciary duties owed to her and to otherwise violate her legal rights including further dilutions.

39. Four days later, on or about December 1, 2005, Itera Group offered to buy all of Galina Weber's shares at a reduced price. Galina Weber rejected this offer.

40. On or about February 22, 2006, the new Itera Group shares were issued, and Galina Weber's ownership interest was thereby diluted to only 4.86%.

41. Itera Group consists of a complex web of over 180 interrelated companies formed under the laws of multiple jurisdictions, including the United States. Itera's financial dealings, books and records are kept as a mystery to shareholders and third parties by Makarov, who is believed to mismanage and loot the companies for his own purposes and to the derogation of shareholders such as Galina Weber, who will not bow to his demands.

42. Itera USA, Inc. is headquartered in Jacksonville, Florida, as is Itera International Energy, Corporation. Both companies are subsidiaries of the Itera Group and Jacksonville is often a site for Itera business and Board meetings.

43. Moreover, according to the Florida Department of State, Division of Corporations, there are eight (8) active Itera Group subsidiaries registered as Florida business entities. These include: 1) Itera USA, Inc.; 2) Itera International Energy LLC; 3) Itera International Energy Corporation; 4) Itera Funds LLC; 5) Itera CIS LLC; 6) Itera Aviation LLC; 7) Itera Promotions Inc.; and 8) Itera Timberland & Development Strategies LLC.

44. In November 2006, the Ministry of Justice of Georgia ("MOJ") successfully petitioned the United States District Court for the Middle District of Florida to take the deposition and receive documents from Makarov and Itera International Energy LLC, a Florida corporation and subsidiary of Itera Group, to assist the MOJ in a criminal investigation. A true and correct copy of In the Matter of the Application of the Ministry of Justice of Georgia v. For the Deposition of I.V. Makarov and Documents from Itera International Energy LLC for Use in a Contemplated Criminal Investigation in Georgia and International Arbitration in Russia, Case No. 8/2006, Case No. 3:06-mc-66-J25-TEM ("Georgia Petition") is attached hereto as **Exhibit F**.

45. The MOJ is investigating agreements the Georgian Ministry of Energy ("MOE") executed with Itera Group in or about 2003. These agreements, which have allegedly caused damage to the budget of Georgia, provide for the purchase of natural gas from the Itera Group. See ¶¶ 14 & 19 of the Georgian Petition.

46. Moreover, the MOJ's belief that the dealings between the Itera Group and MOE were improper is bolstered by the allegation that the Itera Group is being used as a "vehicle to park

8

choice assets siphoned from Russia's Gazprom (the world's largest gas company) for their own personal enrichment." See ¶¶ 21-22 of the Georgian Petition.

47. The Middle District Court ultimately granted in part MOJ's request for a deposition and documents. See true and correct copy of the Court's Order attached hereto as **Exhibit G**.

48. Like the Republic of Georgia, Galina Weber likewise requires discovery to aid her with respect to determining the true facts for use in the Cypriot and Swiss Actions.

## III.   Legal Analysis

### A. The Statutory Requirements

Section 1782 of Title 28 of the United States Code authorizes a United States District Court, upon petition of an interested person, to order a person residing in the district to give testimony or produce documents for use in a foreign proceeding:

> The District Court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusations.  The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. . . . To the extent that the order does not provide otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a).

Galina Weber's Petition satisfies all of the statutory requirements found in section 1782 in order for this Court to enter an Order to permit her to obtain discovery for use in a foreign proceeding.  Specifically, Galina Weber is an interested party in that she is the Claimant in an action in the District Court of Limassol, Cyprus (the "Cypriot Action") as well as a defendant in

the Swiss Action. Secondly, the individuals from whom evidence is sought (the "Florida Shareholders") each reside, or may be found, within this District. Thirdly, Galina Weber seeks certain documents in the possession of the Florida Shareholders to be produced in support of her claim in the Cypriot Action and her defense in the Swiss Action. Thus all the statutory requirements are satisfied.

**B. The Intel Factors**

The United States Supreme Court interpreted section 1782 as having a broad application. Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 259 (2004). In determining that section 1782 authorizes a federal district court to provide discovery assistance, the Supreme Court specifically rejected the multiple limitations Intel attempted to inject into the interpretation of the statute. Intel, 542 U.S. at 256. Rather the Supreme Court adopted a broad and liberal interpretation of the statute and provided guidelines for future application of the statute by federal district courts. Id.

Following the Supreme Court's guidance, the United States Court of Appeals for the Eleventh Circuit emphasized that "[t]he purpose of Section 1782 is to liberalize the assistance given to foreign and international tribunals." In re Patricio Clerici, WL840327 (11th Cir. March 21, 2007).

In Clerici, the Eleventh Circuit encapsulated the factors identified by the Supreme Court that a district court should evaluate in determining whether a section 1782 petition should be granted as follows:

> (i) whether the person from whom discovery is sought is a participant in the foreign proceeding;
>
> (ii) the nature of the foreign tribunal, the character of the proceedings underway, and the receptivity of the foreign court to United States judicial assistance;

(iii) whether the petition attempts to circumvent foreign discovery restrictions or procedures; and

(iv) whether the request is otherwise unduly intrusive or burdensome.

<u>Clerici</u>, WL840327.

As discussed in more detail below, the instant Petition satisfies the requirements of the statute in all respects, as well as the <u>Intel</u> factors, and should thus be granted in its entirety.

### 1. Parties to the Foreign Proceeding

If the person from whom discovery is sought is a party to the underlying foreign proceeding, this fact weighs against granting a section 1782 petition. See <u>Clerici</u>, WL 840327. The reasoning is that the foreign court likely has jurisdiction over the parties to the underlying action, so it can simply order the production of evidence without external assistance. <u>Intel</u>, 542 U.S. at 264. On the other hand, when discovery is sought from a non-party located outside the foreign court's jurisdiction and in the United States, section 1782 may assist the foreign court and/or the named parties in obtaining such evidence. <u>Id.</u>

In the present Petition, the parties to the Cypriot Action are Galina Weber, Itera Group, Ltd. ("Itera Group"), Makarov, and Sweet Water Intervest Corporation of British Virgin Islands. The parties to the Swiss Action include Galina Weber and the government of Switzerland. None of the Florida Shareholders, excepting Makarov, are individually named in either the Cypriot Action or the Swiss Action. While Makarov is a named party in the Cypriot action, he is not a party in the Swiss criminal action. Because the majority of the persons from whom discovery is sought are not a party to either Action, and because neither the Cypriot court nor the Swiss court possess jurisdiction over any of the Florida Shareholders, excepting Makarov, this factor weighs in favor of granting Galina Weber's petition.

## 2. Cypriot Courts & Procedures

The Supreme Court has implied that there is a presumption in favor of assuming that a foreign court will be receptive to American judicial assistance. See Intel, 542 U.S. at 261. In holding that there is no requirement for the evidence obtained to be discoverable in the foreign proceeding, the Court noted that a foreign court might welcome evidence obtained under section 1782 even when it would not have been otherwise obtainable under the foreign court's rules. Id. at 261-262. Similarly, the Eleventh Circuit reasoned in Clerici that because there was no reason to suggest that the foreign court would not be receptive to evidence obtained under section 1782, the third and fourth Intel factors weighed in favor of granting the section 1782 petition.

The Cypriot Action is currently pending in the District Court of Limassol, a court of first instance in Cyprus that possesses jurisdiction to hear and determine civil actions. The Cypriot judicial system is based on English common law, as is the American judicial system. Specifically, the Cypriot Constitution grants each individual the fundamental right "to present his case before the court and to have sufficient time necessary for its preparation; [and] to adduce or cause to be adduced his evidence and to examine witnesses according to law." Const. of the Republic of Cyprus. Part 2, art. 30, §3.

Because the Cypriot and American judicial systems are based on similar principles, there is no reason to believe that the present petition is an attempt to circumvent Cypriot discoverability rules. Likewise, there is no reason to believe that the District Court of Limassol would not be receptive to judicial assistance from the United States, a nation with a similar legal system.

### 3. Swiss Courts & Procedures

Switzerland is a democratic country subscribing to most of the ideals with which the United States is identified. While the Swiss legal system is based on civil law, rather than on common law, criminal defendants are afforded many of the same substantive and procedural guarantees they would enjoy in the United States. For example, criminal defendants in Switzerland benefit from the presumption of innocence, right of habeas corpus, speedy trial, right to counsel, right to appeal, and "the opportunity to exercise [his or her] means of defense." See Fed. Const. of the Swiss Confederation. Title 1, arts. 29-32.

However, criminal procedure differs in Switzerland in that there is no trial by jury, and discovery is completed by an investigating magistrate before bringing formal charges. The matter will then be adjudicated by the investigating magistrate based on evidence obtained during the discovery period and on oral arguments at trial. Switzerland openly accepts assistance in criminal matters from foreign judicial authorities such as the United States District Courts.

In the present Petition, Galina Weber seeks compulsion of documents which may aid her criminal defense in the Swiss Action. Pursuant to Swiss law, a crucial aspect in establishing Galina Weber's innocence is proving that Itera Group was indebted to her because it never paid her the full amount of the Second Tranche. Itera Group now denies the Second Tranche was distributed when in fact the monies were transferred to the other shareholders. In other words, Galina Weber asserts that Itera Group owed her $4.8 million for the Second Tranche for twelve percent (12%) out of her 14.5714%,[2] and that she was never paid this sum whereas other shareholders were paid their entire sums. Galina Weber needs the documents in the Florida Shareholders' possession or control tending to demonstrate that they received their full shares of

---

[2] Galina Weber did receive approximately a portion of the Second Tranche; however, that distribution equaled only 2.5% of Galina Weber's total shares.

the Second Tranche. Moreover, because the Swiss Action is currently in the investigative discovery phase, it is vital to Galina Weber's defense that she timely provides the Magistrate with these documents as evidence of her innocence. Galina Weber, if convicted, faces multiple years of incarceration and tens of thousands of dollars in fines.

### 4. The Information Sought

Galina Weber seeks the production of documents in the Florida Shareholders' ownership, possession, or control which proves that the $40 million Second Tranche of dividends declared in January 2005 was distributed to them in amounts proportionate to their respective ownership interests in Itera Group. This request is directly relevant to Galina Weber's underlying Cypriot Action, in which she has claimed dilution of her ownership interest in Itera Group, as well as that she never received distribution of her full share of the Second Tranche. The defendants in the Cypriot Action, as well as in interviews with government officials in the Swiss Action, deny that the Second Tranche was ever distributed. Galina Weber has a reasonable belief otherwise and she seeks further evidence to prove this critical element in the Cypriot and Swiss Actions.

Moreover, Galina Weber believes Makarov conspired with the Itera Group Board of Directors to dilute Galina Weber of her rightful percentage of ownership in Itera Group. Specifically, Makarov desired to increase the share capital because Makarov wanted to dilute Galina Weber and put further pressure on the value of Galina Weber's shares. The Itera Group Board of Directors followed Makarov's lead because they were dependent upon him funding their respective share increases so they would not be diluted. Moreover, the Itera Group Board of Directors had conspired with Makarov in shielding the Second Tranche and thus had little choice but to continue in lock-step with him. Galina Weber possesses correspondence implying that the Florida Shareholders may have received their full distribution from the Second Tranche

14

under the guise of either a loan, proceeds from the sale of shares, a transfer of shares, or other disguised method of payment to avoid tax liability. As a result, it is likely that the Florida Shareholders have in their possession, ownership, or control documents proving that they received their full share of the Second Tranche.

### C. The Subpoenas

In order to support her position in both the Cypriot and Swiss Actions, Galina Weber intends to serve each of the Florida Shareholders with a request for production of documents in accordance with the Federal Rules of Civil Procedure. See 28 U.S.C. § 1782(a). A sample copy of a proposed subpoena and request for production, which are in the process of being served on the respondents, is attached hereto as **Exhibit H**.

### IV.    Conclusion

For the foregoing reasons, Petitioner, Galina Weber, seeks documentation of any transaction which may in fact have disguised distribution of the full Second Tranche. Because such documentation is likely to be in the possession, ownership, or control of the Florida Shareholders, each of whom resides within the Middle District of Florida, Petitioner respectfully petitions this court for entry of an Order granting the Petition and permitting service of the proposed subpoenas and discovery requests, attached hereto; compelling Respondents to comply with the discovery served; and allowing further follow-up documentary discovery based on information obtained through this proceeding. A proposed order for the Court's consideration is attached hereto as **Exhibit I**.

Respectfully submitted,

HOLLAND & KNIGHT LLP

By: _____

Lawrence J. Hamilton II (FBN) 0355691
larry.hamilton@hklaw.com
Daniel K. Bean (FBN) 0015539
daniel.bean@hklaw.com
Sarah Stoddard Toppi (FBN) 0029608
sarah.toppi@hklaw.com
Holland & Knight LLP
50 N. Laura Street, Suite 3900
Jacksonville, Florida 32202
904.353.2000
904.353.1872 Facsimile

*Attorneys for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2007, I filed the foregoing Petition for Discovery with the Clerk of the Court and I mailed the foregoing document via first-class mail to the following:

Charles B. Lembcke, P.A.
1300 Riverplace Boulevard
Suite 605
Jacksonville, Florida 32207-9018
*Attorney for **Theodorus J. Kavalieros** and*
***Afroditi Kavalieros***

I further certify that I served the foregoing document through Mulholland Investigations & Security Consulting, Inc., process service, this 27th day of April, 2007.

Lazar S. Finker
9934 Chelsea Lake Rd.
Jacksonville, FL 32256
*Shareholder*

Raissa M. Frenkel
9934 Chelsea Lake Rd.
Jacksonville, FL 32256
*Shareholder*

Steve Koegler
24716 Harbour View Drive
Ponte Vedra Beach, FL32082
*Shareholder*

William E. Chattin
11958 Laura Rose Ct.
Jacksonville, FL 32223
*Sharehodler*

Igor V. Makarov
832 A1A N. - Suite 16
Ponte Vedra Beach, Florida 32082
*Shareholder*

_____
Attorney

# 4508822_v1

17